# FLORIDA WILDLIFE FEDERATION, INC. and FRIENDS OF BARRIER ISLANDS, INC. v ADMIRAL CORPORATION and ST. JOHNS RIVER WATER MANAGEMENT DISTRICT

Case No. 86-3272

State of Florida, Division of Administrative Hearings

December 9, 1986

## APPEARANCES OF COUNSEL

**Timothy Keyser** for petitioners.

**Richard S. Brightman** and **Carolyn S. Raepple, Hopping Boyd Green and Sams,** for respondent, Admiral Corporation.

**Kathryn L. Mennella** and **Wayne E. Flowers** for respondent, St. Johns River Water Management District.

## OPINION OF THE COURT

CHARLES C. ADAMS, Hearing Officer.

## RECOMMENDED ORDER

Following the provision of notice, a formal hearing was held in this case in accordance with Section 120.57(1), Florida Statutes. The dates of hearing were October 27 and 28, 1986. The place of hearing was Palatka, Florida. Charles C. Adams served as the hearing officer. This recommended order is being entered upon the receipt and review of the transcript of the proceedings and the proposed recommended orders offered by Petitioners and Respondents. The fact finding suggested in the proposals has been utilized in some instances. Otherwise, the suggested fact findings are rejected for reasons as described in the appendix to this recommended order.

## ISSUES

The issues in this cause are related to the question of whether Admiral Corporation (Admiral) should be granted a construction and operation permit for a management and storage of surface waters system for the Hammock Dunes, Phase I, development. The agency with permit review responsibility is the St. Johns River Water Management District (District). This hearing is occasioned by the challenge by Petitioners to the notice of intent to grant the subject permit.

## FINDINGS OF FACT

### Part A

The following facts are found based upon the prehearing stipulation of facts entered into by the parties:

1. Petitioner Florida Wildlife Federation, Inc., is a non-profit corporation organized under the laws of Florida. Florida Wildlife Federation, Inc.'s address is Post Office Box 15917, West Palm Beach, Florida 33416.

2. Petitioner Friends of Barrier Islands, Inc., is a non-profit corporation organized under the laws of Florida. Friends of Barrier Islands, Inc.'s address is Rt. 1, Box 161K, St. Augustine, Florida 32086.

3. Respondent Admiral is a corporation organized under the laws of Florida. Its address is 4 Office Park Drive, Palm Coast, Florida 32037.

4. Respondent District, a special taxing district, created by Chapter 373, Florida Statutes, is charged with the statutory responsibility of the administration and enforcement of permitting programs pursuant to Part IV of Chapter 373, Management and Storage of Surface Waters (MSSW), specifically Sections 373.413 and 373.416, Florida Statutes, and Chapter 40C-4, Florida Administrative Code. Furthermore, pursu-

142

ant to Section 403.812, Florida Statutes, the District has received a delegation of the powers and duties of the Department of Environmental Regulation pertaining to the administration of Chapter 17-25, Florida Administrative Code, "Regulation of Stormwater Discharge" with power to administer the rule's requirements through implementation of Chapter 40C-42, Florida Administrative Code. The District is the agency affected in this proceeding. The District has assigned Admiral's MSSW permit application which is the subject of this proceeding the permit no. 4-03500013A.

5. On March 21, 1986, Respondent Admiral submitted to Respondent District an MSSW permit application no. 4-035-0013A to construct and operate a surface water management system to serve a 768 acre development known as Hammock Dunes, Phase I, located in Flagler County, Florida.

6. Hammock Dunes, Phase I, is located on property bounded on the west by State Road A-1-A and on the east by the Atlantic Ocean. The existing Jungle Hut Road marks the majority of the northern boundary of Hammock Dunes, Phase I, and State Road A-1-A marks the majority of the southern boundary.

7. On June 11, 1985, Respondent Admiral received from Respondent District, MSSW permit no. 4-035-001C granting conceptual approval of the surface water management system for the entire 2258 Hammock Dunes development, of which Hammock Dunes, Phase I, is a part. Petitioners received written notice of the District staff's intent to recommend approval of the conceptual approval application and a notice of rights. Petitioners attended the Governing Board meeting at which the application was approved, speaking in opposition to the permit application. Petitioners did not petition for an administrative hearing or seek review of the agency action in any legal forum.

8. On July 25, 1986, District staff gave notice of its intent to recommend approval with conditions of Admiral's MSSW permit application no. 4-035-0031A to construct and operate the surface water management system for Hammock Dunes, Phase I.

9. Petitioners' Petition for Administrative Hearing was timely filed with the District.

10. All surface waters which are proposed to receive surface water discharges from the surface water management system proposed by application no. 4-035-0031A which is the subject of this proceeding are Class III surface waters and are not Outstanding Florida Waters.

11. Hammock Dunes is an approved development of regional impact.

143

12. The proposed surface water management system for Hammock Dunes, Phase I, is consistent with the plans approved in the conceptual permit issued by the St. Johns River Water Management District.

By an amendment to the prehearing stipulation, the parties agree that it is not necessary to consider the implications of the Hammock Dunes development as it might endanger life or property, with the exception of the implications of that development as they affect drinking water quantity and quality. The issues pertaining to drinking water are discussed in subsequent fact finding.

## Part B

The remaining facts are found based upon the record created at hearing, in view of the demeanor of witnesses who testified and based upon suggested facts proposed by the parties.

13. Florida Wildlife Federation, Inc., has statewide membership with approximately 20 members living in the Hammock Dunes area, including several who use shallow wells immediately west of Phase I. The groundwater associated with those wells and in other locales in the vicinity of the proposed project is the source of potable water for commercial and domestic uses by local residents. Some of these individuals use purification treatment devices on the groundwater extracted. Members of the Federation also enjoy the wildlife found in the area.

14. Friends of the Barrier Islands, Inc., has hundreds of members, some of whom own and reside on lands adjacent to the Hammock Dunes tract and who are dependent on area groundwater for their potable water. Some members fish the mosquito control ditches along the boundaries of the tract.

15. Hammock Dunes is a proposed development located on the Atlantic Ocean coast, midway between St. Augustine and Daytona Beach.

16. Hammock Dunes is an approved development of regional impact (DRI). The total project covers over 2200 acres, and approximately 6670 residential units are planned to be constructed over a 20-year build-out period. The residential units will cover approximately 40 per cent of the Hammock Dunes property, with the other 60 per cent being left as open space and public facilities. Approximately 400 acres will be preserved in their natural state, and an additional 500 acres will be converted into golf courses, parks, school sites, and other public amenities.

17. The approval of the Hammock Dunes, Phase I, development,

144

including the approval sought in this proceeding, triggers the dedication by Admiral to Flagler County of 67 acres for oceanfront parks. These recreational facilities will have a capacity for 20,000 peak-day user, and provide parking for over 3,000 cars. In addition, dune walkovers will provide access to the beach while the protecting the dunes. Admiral Corporation will also contribute to the cost of constructing a dune driveover.

18. Phase I of Hammock Dunes covers approximately 768 acres on which a little over 1700 residential units will be built. Thirty-seven per cent of the Phase I property will be used for residential land uses, while 63 per cent will be left as open space and other activities, including a preserved hammock, functional wetlands, and a golf course. Based upon this land use mix, the runoff coefficient for the Phase I development will be 0.3.

19. The Hammock Dunes DRI, of which Phase I is a part, includes a bridge over the Intracoastal Waterway to connect the Palm Coast area to the Hammock Dunes area. The bridge and its stormwater runoff management system are not part of Phase I. They have been previously permitted.

20. In the vicinity of the project site, Washington Oaks State Gardens is found. It is a tract of public land located to the north of the northern boundary of the Hammock Dunes DRI project. It uses groundwater as potable water and for irrigation. Private lands are located between the northern boundary of the overall Hammock Dunes and the southern boundary of the public land. Phase I of the Hammock Dunes exists in the southern part of the Hammock Dunes. The project in question will cause no adverse effects to the public or private property to the north related to water quality or quantity or otherwise.

21. Hammock Dunes is surrounded by salt waters. It contains several habitat types ranging from beach and dune communities near the ocean to a hardwood forest at the westerly edge of the site.

22. In order to determine the geologic and hydrogeologic characteristics of Phase I (hereinafter referred to as "on site" or "the site"), Admiral conducted a study which included the drilling of eleven shallow wells and two deep wells on site. It also conducted a pump test at the site in furtherance of this inquiry.

23. The well drilling informtion revealed that medium to fine grain sands exist to a depth of approximately ten feet. Below this level to an approximate depth of forth feet below land surface are found a series of undifferentiated sand and shell materials. At an approximately depth of forty feet, which constitutes the base of the surficial aquifer, to a depth

of approximately fifty feet, there exists a very stiff clay layer known as the Hawthorn formation. This formation acts as a confining unit between the surficial aquifer and the Floridan aquifer which underlies the formation.

24. An outcropping of consolidated material known as the Anastasia formation can be seen on the Atlantic coast beach to the east of the site. This formation does not extend to the western boundary of the site.

25. The pump test performed on the site by Admiral was sufficient to determine the characteristics of the surficial aquifer. The transmissivity of the surficial aquifer, i.e., the ability for the water to move through the aquifer, is approximately 12,500 gallons per day per foot. Expert witnesses in the field of hydrogeology who testified at hearing did not find this value for an aquifer of that type to be other than as expected.

26. A lens of fresh water that is of drinking water quality underlies most of the island. This is related to the surficial aquifer. Rainfall is the only source of replenishment or recharge. As a consequence, the water table fluctuates depending on rainfall patterns and seasonal or climatic cycles and drawdown by the mosquito control district in operating its ditches.

27. Currently on the site there exists a groundwater divide located approximately 2,000 feet east of State Road A-1-A. This groundwater divide runs in a north-south direction. Therefore, the groundwater movement occurs in an east-west direction. In other words, a moecule of water landing on the west side of the divide will percolate into the soil and flow westward toward the Intracoastal Waterway, while water landing on the east of the divide will flow eastward to the Atlantic Ocean. The direction of the flow will remain the same after construction of the system.

28. It will not be possible for a molecule of groundwater anywhere within the proposed Phase I project to migrate to Washington Oaks State Garden because the groundwater flow will not proceed in that direction.

29. The Hammock Dunes, Phase I, surface water management system which Admiral proposes on the site will include 77 acres of excavated lakes interconnected with 11 acres of created freshwater marsh and integration of 19 acres of existing wetlands.

30. After excavation the lakes will directly connect with the groundwater in the surficial aquifer and mix surface waters with the groundwater. This will increase the amount of water exposed and lost to

146

evaporation. The excavations will occur below the water table and penetrate the surficial aquifer. However, on balance, the water management system will increase the amount of water at the site.

31. As stated, the mosquito control ditches currently serve to drain the surficial aquifer of its stored water. Most of these ditches will be filled; however, one 800 foot ditch in the southeast section of the site will not be filled, and a dredge and fill permit application related to that ditch as previously filed with the Department of Environmental Regulation has been withdrawn.

32. Water control structures will be constructed to control the discharge from the proposed system to surface waters. These water control structures will maintain the water level in the system at or above 4.0 NGVD 77% of the time. The minimum water level in the system, even in a dry year, will be 2.7 NGVD. Presently, discharge to adjacent surface waters occurs through existing culverts t invert 1.2 feet NGVD. These culverts are connected internally north/south by the existing mosquito control ditches and this tends to bleed down groundwater in the area to the elevation 1.2 NGVD, thus allowing flow into the receiving surface waters.

33. The entire site is located above the 100-year flood elevation, and the proposed control structures have been designed to withstand the 100-year storm event. A 100-year storm surge is not expected to overtop the dunes. However in the unlikely event that ocean waves did wash over the dunes, any salt water in the water management system will be detected by a monitoring system and will be collected and drained by the system through sumps and water control structures.

34. There are numerous dune breaches on the site which have been caused by various events over time. As part of Phase I, Admiral will repair these dune breaches and restore them to their natural state.

35. The golf course to be constructed as part of the Phase I development will be irrigated with treated domestic wastewater, except within 500 feet of the Phase I property boundaries. The area to be irrigated with treated wastewater will include about 90% of the Phase I golf course, or about 75 acres. The remaining golf course area, within a 500-foot buffer, will be irrigated with potable water. All golf course irrigation water, whether treated wastewater or potable water, will be imported to the Phase I development from west of the Intracoastal Waterway. The golf course fairways will receive approximately two inches of treated wastewater per week, or approximately 100 inches per year. The amount of water imported to the Phase I development for golf course irrigation purposes will be about 600,000 gallons per day.

147

36. The irrigation water on the golf course will percolate through the soil and into the groundwater table. It will then move laterally into the lake system. The flow of this groundwater will be from the water table into the lake system at all times, rather than in the other direction, except for a small portion of the flow beneath part of three golf fairways which will tend to flow off site. Nothing about these flow regimes will adversely affect off-site locales through violation of applicable water quality standards.

37. As described, the treated effluent for fairway irrigation will be piped initially from the existing wastewater treatment plant in the western part of Palm Coast, a development located west of the Intracoastal Waterway. Later, it is expected that treated effluent from a wastewater treatment plant located at Hammock Dunes will be used for irrigation. This plant will be located north of the Jungle Hut Road, outside the boundaries of Phase I. The plant will serve to treat sewage from the entire Hammock Dunes development. Until it is constructed and builds up sufficient effluent volume to supply the effluent needed for golf course irrigation, effluent will continue to be piped from the Palm Coast plant.

38. The interim effluent for fairway irrigation will be supplied from a domestic sewage treatment plant which has no industrial component to its wastewater influent. Water quality analyses of the effluent reveal no heavy metal concentrations or presence of any priority pollutants.

39. Any surface runoff from Phase I will be conveyed by overland flow and grassy swales to the interconnected lakes which will serve as wet detention ponds.

40. The created lakes and marshes will be planted with littoral zone vegetation.

41. The created marshes will have 4:1 side slopes from finished grade (about eight feet NGVD) to the control elevation or four feet NGVD. From the control elevation to a water depth of eighteen inches, the side slope will be 10:1. The design water depth of the entire remainder of the marshes will be eighteen inches except for a channel about 20 feet wide, the sides of which will slope to a depth of 6 feet at a 2:1 ratio.

42. The lakes themselves will have over ten miles of shoreline. About three and one-half miles of this lake shoreline littoral zone (or about one-third of the total) will be at a side slope of 10:1 with the remainder being at a side slope of 4:1.

43. In determining the impact of the proposed system on the recharge and storage in the surficial aquifer, factors which must be

148

considered include rainfall, filling, excavation, evaporation from water bodies, evapotranspiration from vegetation, and effluent application. The net effect of the system proposed by Admiral will be to increase the amount of recharge and storage in the surficial aquifer.

44. The increase in stage of the surface waters on site to elevation 4.0 feet NGVD as a result of the water control structures, combined with the approximately 600,000 gallons per day of water imported to the Phase I development, will increase the availability of groundwater in the general area of the project site.

45. Presently, in the area of Phase I, water table elevations range from approximately one and a half feet above mean sea level to about six and a half feet above mean sea level. The lowest points in the water table are located on property closer to the Intracoastal Waterway. This explains why individuals with shallow wells tapping the surficial aquifer experience salt water intrusion from the Intracoastal Waterway.

46. Removal of the existing system of mosquito control ditches and associated structures and replacement with the proposed surface water management system and treated effluent irrigation will result in higher groundwater elevations. As a result, the saltwater/freshwater interface will be improved in favor of the freshwater side, limiting saltwater intrusion. This aspect of the proposed system will benefit existing users of the surficial aquifer located between the western boundary of the site and the Intracoastal Waterway.

47. The use of treated effluent rather than potable water for golf course irrigation allows increased availability of potable water for other uses which require the water to be potable. In essence, this arrangement conserves the water resources of the region.

48. Pollutants which are expected to be present in the runoff from Phase I are the metals: cadmium, chromium, copper, iron, lead and zinc; nutrients: total nitrogen, total Kjedahl nitrogen, nitrates, total phosphates and orthophosphates; coliforms: total coliforms and fecal coliforms; oil and grease; and pesticides.

49. Admiral does not propose a stormwater discharge facility which utilizes a design described in Rule 40C-42.035, Florida Administrative Code, entitled "Stormwater General Permits." In lieu of this design, Admiral has proposed an alternative treatment system. The alternative treatment system utilizes grassed swales, created freshwater marshes and created lakes which act as wet detention basins with a mean residence time of approximately 92 days, gradual sideslopes and planted littoral zone vegetation.

50. Admiral's proposed system maximizes treatment efficiencies, i.e.,

pollutant removal, through the following mechanisms: filtration, sedimentation, adsorption, precipitation, biological activity and dilution.

51. The alternative treatment system proposed by Admiral will provide equivalent pollutant removal when compared with the stormwater facility designs generally permitted.

52. The proposed system discharges at two culverts at the south end of the site to the Florida East Coast Canal and at the existing 800 foot ditch in the southeastern part of the project. These three points are considered as discharge into the receiving surface waters.

53. Maximum metal concentrations in the groundwater seepage through the proposed fairways and swales are found immediately below the fairways and swales. These concentrations do not exceed allowable values for drinking water and Class III waters.

54. Concentrations of nutrients can be expected in the groundwater seepage below the fairways and swales. The concentration for nitrate will not exceed the drinking water standard. Concentrations of all nutrients are expected to fall within the background range of the surrounding receiving surface waters and will not cause an alteration so as to cause an imbalance in natural populations of aquatic flora and fauna.

55. Metal concentrations in the groundwater seepage will exist immediately below the proposed wet detention ponds. They will not exceed drinking water standards and Class III standards.

56. Nutrient concentrations in the groundwater seepage will exist immediately below the proposed wet detention ponds. The expected concentrations of nitrate immediately below the ponds will not exceed the drinking water standard for nitrate. Expected nutrient concentrations fall within the range of existing background conditions in the receiving surface waters and will not result in an alteration so as to cause an imbalance in natural populations of aquatic flora and fauna.

57. The quality of the surface water in the proposed lake system will meet Class III surface water quality standards. This applies in the lakes and, at the point of discharge from the proposed lake system, to the adjacent Class III receiving surface waters. This is true for all of the pollutants likely to be generated by the Phase I development, including metals, nutrients, oil and grease, coliforms, and pesticides.

58. In addition to meeting the Class III criteria, the concentrations of pollutants in the discharge from the proposed Phase I lake system will be within the range of the concentrations of those pollutants already in the adjacent Class III surface receiving waters. Conse-

150

quently, the discharge will not result in the dominance of nuisance species; not alter nutrient concentrations so as to cause an imbalance in natural populations of aquatic flora or fauna; not create nuisance conditions or conditions harmful to health or safety; and not contain constituents in concentrations which are carcinogenic, mutagenic, teratogenic or toxic to humans or aquatic species. All minimum criteria will be met in both surface water and groundwater.

59. Due to the type of soil and the removal mechanisms present, no coliform bacteria levels are expected in the groundwater as a result of the proposed system. Coliform bacteria discharged into the receiving waters will not exceed standards for Class III waters.

60. Oil and great in runoff from Phase I will be prevented from entering the wet detention systems and any receiving waters by the installation of oil baffles or skimmers.

61. Given the type of development proposed for Phase I and the pollutant removal mechanisms in the proposed system, the concentrations of metals, nutrients, oil and grease, and coliform bacteria will meet primary and secondary drinking water standards prior to discharge into the wet detention ponds.

62. Admiral will employ an integrated pest management program to control pests. This plan is required to be submitted to the District staff for review and approval. Given the limitations on class and characteristics of allowable pesticides, there will be no exceedance of groundwater water quality standards.

63. The proposed system will not create a water quality nuisance or a condition harmful to health or safety or discharge pollutants in concentrations which are harmful to humans, wildlife or aquatic species.

64. Admiral will employ a surface water and groundwater monitoring program for all parameters of concern. This will alert the applicant to problems that may occur related to the parameters and allow remedial action to be taken.

65. Given the high degree of pollutant removal in the proposed system, a zone of discharge of 100 feet would be sufficient to protect the existing users of the surficial aquifer. The groundwater beneath the golf course fairways and swales will meet the primary and secondary drinking water standards and the other G-1 groundwater standards within 100 feet of the point of discharge.

66. The quality of the groundwater beneath the proposed lakes will be unaffected by the lakes because the groundwater flow will basically

be from the water table into the lakes, rather than in the other direction. Even if water were to flow out of the proposed lake system into the adjacent groundwater, no groundwater quality standards would be violated because the water in the lakes will meet the primary and secondary drinking water standards.

67. Groundwater flowing off site will also meet the primary and secondary drinking water standards.

68. During the construction, erosion problems will be prevented by Admiral's erosion control plan. The erosion control plan submitted with the application for the Phase I MSSW permit is adequate to protect Class III water quality standards during construction of the Phase I surface water management system.

69. Dewatering during construction will be conducted in accordance with the Hammock Dunes Surficial Aquifer Mitigation Plan to ensure that groundwater levels are not lowered and existing users of the surficial aquifer are not harmed.

70. The Dunes Community Development District, organized pursuant to Chapter 190, Florida Statutes, will own, operate and maintain the proposed water management system. This organization will perform any necessary littoral zone management. The proposed system will be easy to operate.

71. The proposed system will not cause an increase in the peak rate of discharge from the Phase I site.

72. Phase I will promote no effect on surface water levels off-site. On the project site, both ground and surface water levels will be stabilized.

73. Phase I will not adversely impact the off-site storage and conveyance capacity of any surrounding water bodies or water courses.

74. On site there presently exist two maple swamp areas which have been identified as wetlands. They are imperfectly drained. These areas will be preserved with the exception of approximately one acre on the northern end of the southernmost maple swamp which will be filled for construction of a roadway. Varn Lake is a borrow pit presently on the site. It has nearly vertical side slopes. The lake supports a very narrow strip of littoral vegetation. However, it is heavily overgrown with aquatic weeds and is presently very low quality habitat for fish. Varn Lake will, according to the plan of development, be renovated by the mechanical removal of aquatic vegetation resulting in a vastly improved aquatic and wetlands habitat which is more accessible than that which presently exists. A small isolated cattail pond of less than one acre in size was also identified as a wetland area. It will be filled as a result of the development.

152

75. The mosquito ditches on site are weed-choked and subject to periodic weed removal by the East Flagler County Mosquito Control District, which disrupts the aquatic species that are found there. The mosquito control ditches which exist on the Phase I property have served to lower the water table, thus reducing or eliminating any wetlands functions served by what were once interdunal swales. Although the mosquito control ditches do support some fish and some aquatic and wetlands vegetation, the quality of the vegetation is poor. Varn Lake is not a very good fish habitat. Because of the vertical side slopes of the ditches and because of the heavy overhanging canopy of trees, the suitability and availability of the ditches as a foraging area for wading birds such as the woodstork is severely limited. In summary, there are limited wetlands functions being served by the mosquito control ditches.

76. The development of Hammock Dunes, Phase I, will have a beneficial effect on wetlands in the area. The lakes to be constructed as part of the proposed surface water management system will be a habitat far superior to the existing mosquito ditches. Several marsh wetlands will be created. There will be a substantial increase in water body edges planted with littoral zone vegetation around the lakes and marshes. These littoral zones, of which 70 per cent will be at a 4:1 slope and 30 per cent will be at a 10:1 slope, will serve as shallow water habitat for fish. Varn Lake, after being renovated by mechanical removal of the aquatic weeds, will be incorporated into the connected lake system. The proposed surface water management system would raise the water table and thus serve to rewater two maple swamp wetland areas which are left undisturbed by Hammock Dunes. This change in elevation of the water table enhances wetlands functions performed by the swamps. The hammock located to the west of the site will also profit by the increase of the elevation of the water table by making it more resistant to severe freezes.

77. Aquatic or wetland-dependent species are those species which depend upon aquatic or wetland habitats for the propagation or reproduction of the species such that if the aquatic or wetland habitat were eliminated, the species would not survive in that place. Aquatic or wetland-dependent species which have been identified as possible users of the project site includes various varieties of fish, waterfowl, aquatic birds, alligators, marine turtles, peregrine falcons, raccoons, oppossums, Florida water rats and gopher frogs.

78. The proposed surface water management system will have a beneficial impact on aquatic and wetland-dependent species, and the

**153**

diversity of these species utilizing the Hammock Dunes, Phase I, property should increase.

79. The present linear system of mosquito ditches on the Hammock Dunes, Phase I, property is not adequate to provide food for large numbers of water fowl and aquatic bird species. Consequently, few of these birds are present and virtually none of them nest in this area.

80. There will be a great increase in the utilization of the Hammock Dunes, Phase I, property by water fowl, wading birds, and other water-dependent bird species after the proposed surface water management system is constructed. This increase will result from the increased amount of surface water, the extensive littoral zones and the created marshes.

81. Wading birds such as woodstork, snowy egret, and blue heron are rarely present on the Hammock Dunes, Phase I, property. These birds find little opportunity to successfully feed in the area due to the vertical side slopes of, and the canopy of vegetation over, the existing mosquito ditches. No nesting of these species presently occurs on the Hammock Dunes, Phase I, property. Woodstorks nest with the occurrence of seasonal shallowing of open wetlands which creates a range area to gather food for their young. The present situation at the site is not conducive to nesting activities for the woodstorks. Following the construction of the proposed surface water management system, these bird species will become more prevalent, feeding in the created marshes and the lake littoral zones. Also, the islands to be created in the marsh areas may serve as rookeries, or breeding areas, for some of these wading birds in the future.

82. Woodstorks have not been sighted on the property. Other wading birds such as the snowy egret and the blue heron infrequently attempt to forage in the mosquito ditches or along the edge of Varn Lake.

83. The proposed repairs to the breaches in the dune system will have a beneficial effect on the peregrine falcons and marine turtles that use the beach area.

84. Gopher frogs are apparently not present on the Hammock Dunes, Phase I, property, and therefore impact to this species as a result of the construction and operation of the proposed surface water management system is doubtful.

85. Residents and occasional wildlife will be adversely impacted by the loss and disturbance of the wetland habitats and edges of the mosquito control ditches on site during the intervening construction phase, but in the finished product, wildlife habitat will be superior to existing circumstances.

86. The District staff has recommended and Admiral has indicated that it accepts the following conditions to the issuance of the proposed MSSW permit:

(1) All retention basin side slopes must be seeded and mulched within 30 days following their completion and a substantial vegetative cover must be established within one year of seeding.

(2) A bleeddown orifice or weir must be incorporated into the final design of the outfall structures from the water management system. This bleeddown device must have an invert elevation of 4 feet NGVD and discharge capacity of 2 cfs. Plans showing the bleeddown device must be submitted to the District for District staff approval prior to the construction of the outfall structure.

(3) All construction dewatering must be performed in accordance with the Hammock Dunes Surficial Aquifer Mitigation Plan dated June 27, 1984.

(4) All construction activities must be performed in accordance with the Hammock Dunes Phase I Erosion Control Plan received by the District on June 6, 1986.

(5) In addition to the parameters set forth in the surface water monitoring plan submitted by the permittee, the following parameters shall be sampled on a quarterly basis at the stations specified in the plan:

Total coliform

Fecal coliform

Total N

Nitrate as N

TKN

Orthophosphate

Pesticides applied to golf course

Cadmium

Chromium

Copper

Lead

Iron

Zinc

After three years of operation the permittee may request a modifica-

**155**

tion in the parameters, frequency and duration of the monitoring program based on a demonstration that there is an adequate data base to predict future trends in the effects of discharge from the proposed project and the treatment efficiency of the system.

(6) A staff gauge with a known datum, established by the Florida Registered Land Surveyor, must be installed in the Phase I lake system. Admiral Corporation will be responsible to document the surface elevation of the lake system on a daily basis for a period of three years following the completion of the Phase I discharge structures. This data will be reported to the District on a yearly basis.

(7) Concurrent with the beginning of excavation of the proposed stormwater lakes, the permittee must submit a planting and management plan for the littoral zone and freshwater marshes for District staff approval. The plan must include the wetland species which will be used, the planting densities, timing of planting and any management activities that are intended to ensure the continuance of health of the littoral zone.

(8) Application of sewage treatment plan effluent to the golf course is contingent upon approval by the Department of Environmental Regulation pursuant to Chapters 17-4 and 17-6, F.A.C.

(9) Prior to pesticide use, the permittee ust submit an Integrated Pesticide Management Plan for District staff approval. The selection of pesticides must be based upon short half-lives (1-10 weeks), a low n-octanol/ water partition coefficient and suitability to site specific soil and groundwater PH. The use of organochlorides will not be allowed.

(10) Permittee must adhere to the fertilizer recommendations set forth in the manual for Commercial Turfgrass Management by the University of Florida complied by Florida Turf-Grass Association. The nutrient loading attributable to the application of effluent shall be considered a source of fertilizer for the golf course and additional non-effluent fertilizer sources shall be utilized only to supplement the quantity supplied by the effluent in supplying the total golf course fertilizer needs.

(11) Permittee must excavate sumps in Lakes A, B, K. Q and Varn Lake to the following dimensions: bottom elevation — 8.0 feet; side slopes 2H:1V (below 1 foot NGVD); and bottom dimensions of 10 ft. × 10 ft.

(12) Permittee must alter the design of Water Control Structure #3

156

and #2 to incorporate an operable water control gate or valve which is capable of draining the surface water management system down to an elevation of 1.0 ft. NGVD. These gates or valves must be sluice type devices which are capable of draining water from the bottom of the lake. These gates or valves must be locked in the closed position and may only be opened at the direction of the District.

(13) Permittee must monitor chloride concentrations at depths of 1, 3 and 5 feet at surface water monitoring stations SW-5 through SW-12 on a quarterly basis. This data must be submitted to the District annually.

(14) Should the lake system become contaminated with seawater due to storm surge overtopping the dunes, permittee must take appropriate action to drain the saltwater from the lakes through the use of the gate or valves placed in Water Control Structures #2 and #3 and the sumping or siphoning of saltwater from the lakes at the locations of the sumps. Permittee must notify the District before undertaking any plan to drain the saltwater from the lakes to ensure that water quality standards are met.

These conditions are reasonable and are accepted as fact and as a justifiable policy choice.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction over the parties and the subject matter of this case in accordance with Section 120.57(1), Florida Statutes.

2. Petitioner entered the testimony of Randy Scott Kautz through a deposition taken on October 24, 1986. Respondents objected to the admission of certain portions of the deposition, arguing that some of that testimony was directed to adverse impact of the project on wildlife species other than aquatic and wetland-dependent species. Consequently, it is not believed to be relevant. While the perceptions of the witness Kautz do not coincide with the impression of this case held by the hearing officer, in all particulars, Kautz's observations are sufficiently relevant to remain of record. Therefore, the objections are overruled.

3. Chapter 373, Florida Statutes, empowers the District to regulate the water resources within the confines of the geographical area which includes the project site in question. More specifically, as envisioned by Sections 373.413, 373.416 and 373.426, Florida Statutes, the District through its permit authority must be satisfied that the project at issue

**157**

is not harmful to the water resources of the District or inconsistent with the overall objectives of the District. This is in relationship to the intention on the part of Admiral to undertake the management and storage of surface water within the District boundaries. Moreover, to the extent that the mosquito ditches presently on the site are considered to be abandoned or removed by the applicant, Section 373.426, Florida Statutes, requires that the activities of the applicant associated with the mosquito ditches not be contrary to the overall objectives of the District. In this context, this project can be considered in accordance with Sections 373.413 and 373.416, Florida Statutes, dealing with the evaluation of the proposed management and storage of surface water contemplated as an outcome in this project. That analysis would necessarily speak to the propriety of any claimed abandonment or removal of mosquito district. Put another way, if the applicant can satisfy the provisions set forth in Sections 373.413 and 373.416, Florida Statutes, it has of necessity complied with Section 373.426, Florida Statutes.

4. The basic criteria set forth in Chapter 373, Florida Statutes, as alluded to in the previous paragraph are addressed in substance through Chapter 40C-4, Florida Administrative Code. The applicant must also comply with the requirements announced in the *Applicant's Handbook* for the management and storage of surface waters which are announced in sections 9 and 10 of the handbook.

5. In addition to the regulatory authority reposed in the District as previously described, the State of Florida, Department of Environmental Regulation has delegated to the District permit authority associated with the implications of stormwater runoff. This delegation is in accordance with Section 403.812, Florida Statutes. In furtherance of this mandate, the District administers the concept set forth in the Department of Environmental Regulation's Chapter 17-25, Florida Administrative Code, related to stormwater discharge, by the implementation of the terms set forth in the District's Chapter 40C-42, Florida Administrative Code.

6. Admiral Corporation has given the necessary reasonable assurance of compliance with all applicable statutes and rules to enable it to obtain the permit for management and storage of surface waters.

7. In accordance with the prehearing stipulation by the parties, it is concluded pursuant to Section 40C-4.301(1)(a)1, Florida Administrative Code, that Admiral has given reasonable assurance that the operation of the proposed surface water management system will not adversely affect navigability of rivers and harbors.

158

8. In accordance with the prehearing stipulation by the parties, it is concluded that compliance with Sections 40C-4.301(1)(a)4, 40C-4.301(1)(a)7, and 40C-4.301(2)(a)5, Florida Administrative Code, are not at issue in this proceeding because minimum flows and levels have not yet been established by the Governing Board, pursuant to Section 373.042, Florida Statutes, and there is no work of the District in Flagler County established pursuant to Section 373.086, Florida Statutes, and Chapter 40C-6, Florida Administrative Code.

9. In accordance with the prehearing stipulation by the parties, it is concluded that all surface waters which are proposed to receive surface water discharges from the surface water management system proposed by application no. 4-035-0031A which is the subject of this proceeding are Class III surface waters and are not Outstanding Florida Waters.

10. In accordance with the prehearing stipulation by the parties, it is concluded that the proposed Hammock Dunes surface water management system meets the criterion regarding peak rate of discharge set forth in Sections 10.2.1(b) and 10.3 of the MSSW *Applicant's Handbook.*

11. In accordance with the prehearing stipulation by the parties, it is concluded that the proposed Hammock Dunes surface water management system meets the criterion regarding volume of runoff set forth in Sections 10.201(b) and 10.4.2 and 10.4.3 of the MSSW *Applicant's Handbook.*

12. In accordance with the prehearing stipulation by the parties, it is concluded that the proposed Hammock Dunes surface water management system meets the criterion set forth in Sections 10.2.1(d) and 10.6 to the extent of any impact on the Intracoastal Waterway, the Florida East Coast Canal and the Atlantic Ocean.

13. In addition to the items set forth in Section 40C-4.301(1)(2), Florida Administrative Code, dealt with by the stipulation as to law, the applicant must comply with other provisions within that section. Related to Section 40C-4.301(1)(a), Florida Administrative Code, as duplicated in provisions of Section 9 of the *Applicant's Handbook,* Admiral must meet the following requirements for construction and operation of its water management system:

(1)(a) To obtain a general or individual permit for operation, maintenance, removal or abandonment of a system or to obtain a conceptual approval permit, each applicant must give reasonable assurance that such activity will not:

．　．　．　．　．　．　．　．　．　．　．

2. Adversely affect recreational development or public lands;

3. Endanger life, health, or property;

. . . . . . . . . . .

5. Adversely affect the availability of water for reasonable beneficial purposes;

6. Be incapable of being effectively operated;

. . . . . . . . . . .

8. Adversely affect existing agricultural commercial, industrial, or residential developments;

9. Cause adverse impacts to the quality of receiving waters;

10. Adversely affect natural resources, fish and wildlife;

11. Induce saltwater or pollution intrusion;

12. Increase the potential for damages to off-site property or the public caused by:

a. Floodplain development, encroachment or other alteration;

b. Retardance, acceleration, displacement or diversion of surface water;

c. Reduction of natural water storage areas;

d. Facility failure;

13. Increase the potential for flood damages to residences, public buildings, or proposed and existing streets and roadways; or

14. Otherwise be inconsistent with the overall objectives of the District.

(b) Because a proposed system may result in both beneficial and harmful effects in terms of various individual objectives, in determining whether the applicant has provided evidence of reasonable assurance of compliance with Rule 40C-4.301(1)(a), F.A.C., the District may consider a balancing of specific effects to show the system is not inconsistent with the overall objectives of the District.

Related to Section 40C-4.301(2), Florida Administrative Code, as duplicated in provisions of Section 10 of the *Applicant's Handbook,* Admiral must also satisfy the following requirements for construction and operation of its water management system:

(2)(a) To obtain a general or individual permit for construction, alteration, operation, or maintenance of a system or to obtain a conceptual approval permit, each applicant must give reasonable assurance that such activity meets the following standards:

**160**

1. Adverse water quantity impacts will not be caused to receiving waters and adjacent lands;

2. Surface and ground water levels and surface water flow will not be adversely affected;

3. Existing surface water storage and conveyance capabilities will not be adversely affected;

4. The system must be capable of being effectively operated;

. . . . . . . . . .

6. Hydrologically-related environmental functions will not be adversely affected;

7. Otherwise not be harmful to the water resources of the District.

(b) If the applicant has provided reasonable assurance that the design criteria specified in Applicant's Handbook Part II "Criteria for Evaluation" adopted by reference in Rule 40C-4.091(1), F.A.C. have been met, then it is presumed that the standards contained in subsection (2)(a) above have been satisfied.

The project under discussion is in compliance with the quoted provisions of Sections 40C-4.301(1) and (2), Florida Administrative Code, and as those provisions are duplicated in Sections 9 and 10 of the *Applicant's Handbook*. The project is also in compliance with the balance of those requirements in Sections 9 and 10 to the *Applicant's Handbook* which do not constitute duplications of the language of Sections 40C-4.301(1) and (2), Florida Administrative Code. In summary, the applicant has given reasonable assurances concerning these matters.

14. Section 10.7.4 of the *Applicant's Handbook* brings into issue the requirements set forth in Chapters 17-3 and 17-4, Florida Administrative Code, pertaining to surface water and groundwater. This includes. compliance with Sections 17-3.051, 17-3.061, 17-3.121, 17-3.402, 17-3.403, 17-3.404 and 17-4.245, Florida Administrative Code. The applicant has demonstrated reasonable assurance of compliance with Chapters 17-3 and 17-4, Florida Administrative Code.

15. In the absence of action by the Environmental Regulation Commission in accordance with Section 17-3.403(6), Florida Administrative Code, which would classify the groundwater under consideration as Class G-I, the groundwater at present is found to be Class G-II. Nonetheless, the applicant has demonstrated the necessary reasonable assurance to comply with G-I groundwater standards.

16. As envisioned by Section 17-3.021(26), Florida Administrative Code, the "site" of discharge of the wastewater (groundwater seepage)

161

and stormwater is beneath the surfaces of the golf course fairways, beneath the swales bordering the detention ponds and beneath the detention ponds themselves. Adopting the more stringent requirements for Class G-I groundwater, the applicant is entitled to a zone of discharge of 100 feet from these various "sites" in keeping with the opportunity set forth in Section 17-4.425(3)(a), Florida Administrative Code. At the margin or border of these 100 foot zones of discharge and in the case of the stormwater runoff, prior to discharge into the detention ponds, the water being discharged in the system will meet primary and secondary drinking water quality standards. See Chapter 17-22, Florida Administrative Code.

17. Sections 17-3.021(14) and 17-3.021(28), Florida Administrative Code, define the terms "groundwater" and "surface water," respectively. In consideration of these definitions, the water to be found in the detention ponds is "surface water."

18. In examining Section 40C-4.301(1)(a)14, Florida Administrative Code, neither the District nor Petitioner in this action identified any specific objectives of the District in the geographic area in question, other than those set forth by statute or rule. Consequently, the project cannot be said to be inconsistent with the overall objectives of the District.

19. The applicant has given reasonable assurances of compliance with Chapter 40C-42, Florida Administrative Code, related to stormwater runoff. In particular, the employment of the alternative method of stormwater treatment complies with the design and performance standards contemplated by Section 40C-42.025, Florida Administrative Code.

Having considered the facts of this case and in view of the conclusions of law reached, it is

RECOMMENDED:

That the Governing Board of the St. Johns River Water Management District enter a final order approving the application of Admiral Corporation for a management and storage of surface water permit for Hammock Dunes, Phase I, subject to the terms and conditions identified in this recommended order.

DONE AND ENTERED this 9th day of December, 1986, at Tallahassee, Florida.